Filed 3/19/24  P. v. Sirypangno CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080934 |
| Plaintiff and Respondent, | |
| v. | |
| KONESAVANH DONALD SIRYPANGNO, | (Super. Ct. No. SCD191585) |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Order affirmed; matter remanded with directions.

George L. Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Daniel Rogers and Amanda Lloyd, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

In 2008, a jury convicted Konesavanh Donald Sirypangno[1] of first degree murder, attempted murder, and assault with a semiautomatic firearm, with true findings he committed the crimes for the benefit of a criminal street gang, that he was a principal, and that a principal personally and intentionally discharged a firearm causing great bodily injury or death. After he prevailed in two petitions for writ of habeas corpus, his conviction for attempted murder was vacated and his conviction for first degree murder was reduced to second degree murder.

In 2019, Sirypangno filed a petition under former Penal Code section 1170.95, now section 1172.6,[2] which altered liability for those convicted of murder under the felony murder rule or the natural and probable consequences doctrine. He argued in relevant part that his second degree murder conviction should be vacated because he could not now be convicted of second degree murder under the newly amended murder laws.

In 2022, following an evidentiary hearing, the trial court denied Sirypangno's petition, finding he remained liable for second degree murder under a still valid theory, namely that he directly aided and abetted a murder and did so with express malice. In this appeal, Sirypangno contends the court's determination is not supported by substantial evidence. We disagree and affirm the order.

---

[1]     Sirypangno's first name is sometimes spelled as "Konrsavanh" in the record.

[2]     Unspecified statutory references are to the Penal Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

I.

*Factual Background*[3]

In 2005, Sirypangno and David Phommachanh were documented members of the Oriental Killer Boys (OKB) criminal street gang. Sirypangno's gang moniker was "Reckless"; Phommachanh's moniker was "Felon." Other OKB members included Devin Giraud ("Striker") and Steven Joyce ("Turtle").[4]

On the evening of June 11, 2005, Phommachanh drove his cousin, Danny Boualouang, and Judy Rattana[5] to a friend's residence and later to a birthday party for a girl. Rattana was Phommachanh's girlfriend and the mother of their daughter. Sirypangno, and Joyce and his girlfriend, Melissa Rasasack, drove to these locations in a separate vehicle. Giraud also was at the birthday party. At that party, Rattana learned some of her girlfriends were going to another party in Mira Mesa and decided to accompany them.

---

[3] The following factual background is taken nearly verbatim from this court's opinion in *People v. Sirypangno* (Feb. 15, 2012, D055015) [nonpub. opn.] (*Sirypangno I*).

[4] Giraud and Joyce were charged as defendants in this case. Before trial, Joyce entered a negotiated guilty plea to voluntary manslaughter and an admission he committed the crime for the benefit of a criminal street gang. Giraud entered a negotiated guilty plea to being an accessory after the fact and admitted he committed the crime for the benefit of a criminal street gang.

[5] Rattana was also charged as a defendant in this case, but entered a negotiated guilty plea to voluntary manslaughter and an admission she committed the crime for the benefit of a criminal street gang. As part of the plea agreement, Rattana agreed to testify truthfully at Sirypangno's trial.

3

Rattana left the birthday party with her girlfriends.  The plan was for Phommachanh to first pick up their daughter at her grandparent's house and take her home, then pick up Rattana at the Mira Mesa party and bring Rattana home.

Before Phommachanh went to the Mira Mesa party, he received a call on his cell phone.  Boualouang heard Phommachanh tell someone to bring a "strap," which is street jargon for a gun, because there might be "some problems" at the party.

At about 11 p.m., Phommachanh, Boualouang and Giraud went to the Mira Mesa party, which was in the backyard of a house.  Sirypangno, Joyce and Rasasack went in a separate vehicle.

Access to the party was through a side gate to the backyard; admission cost $2.  At first, Phommachanh and the others were not allowed to enter because there were too many people at the party.  Phommachanh told the two young men who were manning the gate there would be trouble if he and his friends were not allowed inside.  Rattana walked up to the young men at the gate and told them to let Phommachanh and the others in to avoid problems.  Phommachanh, Boualouang, Giraud and Rasasack walked into the backyard without paying.  Sirypangno and Joyce jumped over the backyard fence.

There were a number of altercations at the party that evening, including at least one before Phommachanh, Sirypangno and the others arrived.  While Hasib Farhan, an invited guest, was standing near a young woman, he accidentally blew cigarette smoke in her face and almost burned her hair.  An argument ensued, and Julie Nguyen, who was with the young woman, threatened to have Farhan jumped by OKB members if he did not apologize.  Nguyen, who is known to her friends as "Mai," is an affiliate of

4

OKB.  After Phommachanh and the others entered the backyard, they were greeted by Mai and the young woman.

At one point, some of the invited guests complained they were uncomfortable because Phommachanh and his group were "mad-dogging" or staring at people at the party.[6]  Farhan and some of his friends, all of whom played football in high school, approached Phommachanh and Sirypangno together and told them to calm down or they would have to leave. Sirypangno pulled up his shirt, removed a black semiautomatic gun from his waistband, racked a round and pointed the gun at Farhan.  Although Farhan did not hear Sirypangno say "OKB" or "this is OKB" and did not see Phommachanh flash gang signs, others who were present testified they did. Once the gun was displayed, Farhan's friends pushed him back into the house.  Sirypangno and Phommachanh jumped over the back fence and onto a sidewalk.  In the process, they knocked out one of the wood planks from the fence.

One of the party hosts, Natasha Richardson, who had gone outside with Farhan, approached Mai, tapped her on the shoulder and asked Mai to have Sirypangno put the gun away.  Mai told Richardson not to touch her, yelled "OKB" and punched Richardson in the face.

After Sirypangno and Phommachanh jumped the fence, Sirypangno stayed on the sidewalk behind the backyard of the party house, but Phommachanh did not.  Sirypangno became angry when he overheard portions of a conversation between Tylor Thompson (the victim in the murder count) and Jeremy Waller, who were standing near the fence.  Waller and

---

[6]    Neither the people hosting the party nor the invited guests were gang members.

Thompson were talking about a group of girls who had earlier been fighting and wondered where "the bitches" had gone. From the other side of the fence, Sirypangno said: "Who you guys calling a bitch?" According to Waller's testimony, he and Thompson replied they were not talking to Sirypangno, they did not know him and they did not call him a bitch. Sirypangno threw a piece of wood over the fence at Waller and Thompson. When Waller and Thompson looked over the fence, Sirypangno pulled up his shirt and displayed the gun in his waistband.

K.A. (the victim in the attempted murder count) who also was a friend of Thompson, gave a slightly different version of the over-the-fence exchange between Thompson and Sirypangno. K.A. testified Sirypangno said: "What the fuck did you say?" Thompson replied: "I don't know what you're talking about, I don't even know you, you're tripping" and "I don't know who the fuck you are." Sirypangno said: "You fucking said something, what the fuck did you say, don't be a pussy." Thompson responded: "Fuck you, suck my dick." K.A. testified Sirypangno then said he would catch Thompson outside and threw a piece of wood at them. E.N., a long-time friend of Phommachanh, provided another version of this exchange. E.N., who is not a gang member, testified Thompson said something to the effect that "these guys are not real gangsters[;] they're just bitches." Upon hearing this, Sirypangno responded by saying: "I'm a real fucking gangster[;] you'll see when you get out."

After the Sirypangno-Thompson exchange, K.A., Thompson, his girlfriend, and Brandon Guaderrama, who went to the party with Thompson, remained in the backyard for 15 to 20 minutes before leaving to allow tempers to calm down.

Meanwhile, Phommachanh, Rattana and Boualouang decided to leave the party and go home. As the trio started walking to the car, Giraud called

6

out Phommachanh's name and asked him to return.  Phommachanh and Boualouang walked back to see what Giraud wanted while Rattana continued walking to the car.  A visibly upset Sirypangno then approached Phommachanh and told him about his exchange with Thompson.  According to Boualouang, Phommachanh told Sirypangno not to worry about it and tried to calm him down.  While Sirypangno and Phommachanh were talking, Rattana drove up to the house.  As Phommachanh stepped into the front passenger seat, Sirypangno handed him the gun.  When Rattana asked Phommachanh about the gun, he replied he was just holding it.  Phommachanh then put the gun inside the glove compartment.  Rattana drove away and headed home.

Within five minutes, Phommachanh received a cell phone call to come back and pick up Sirypangno.  The call was made by E.N. at Sirypangno's request.  When they returned, Phommachanh put a bandana over his face, removed the gun from the glove compartment and stepped out of the car.  Phommachanh waved the gun and shouted "who wants it"; he then joined Sirypangno, Joyce and Giraud, who were lined up in front of the house waiting for Thompson to emerge from the backyard.  When Thompson came out, Sirypangno approached him, said "you the fool that fucking told me to suck your dick," and punched or tried to punch him in the face.  Guaderrama then tackled Sirypangno, and Joyce joined the fight as well.  Anderson tried to get Thompson to stop fighting and pull him away.

Phommachanh pointed the gun at Thompson, who put his hands up and said "no."  He pulled the trigger but when the gun did not fire, Phommachanh racked back the slide of the gun to clear the unfired round.  He then fired five shots, striking both Thompson and K.A.  Thompson and K.A. struggled to get up and run away, but both collapsed.

Phommachanh, Sirypangno, Joyce and Boualouang got into the car and Rattana drove away.  The group discovered Joyce had been shot in the foot.  Phommachanh gave the gun to Sirypangno.  Sirypangno then told Rattana to drive to Giraud's house because they needed to hide "the strap."  Rattana dropped off Phommachanh and Sirypangno at Giraud's house, where the gun was hidden in a rice bin.[7]  Rattana then drove home with Joyce and Boualouang.  Phommachanh phoned Rattana and told her to get rid of Boualouang's clothes, which had blood on it from Joyce's wound.  When Phommachanh returned home, he tried to clean the blood from his car.  He told Rattana and Boualouang to say he was at home that night if anyone asked.  Phommachanh also phoned E.N., who had witnessed the shooting, and told him not to tell anyone what had happened.

Thompson bled to death.  He had two gunshot wounds to the left side of his body that could have been caused by the same bullet.  One wound was to the left arm; the other wound was to his left flank.  The bullet that entered the left flank severed the iliac artery and vein.

K.A. had gunshot wounds to her abdomen and right hip.  She had surgery to remove her ruptured appendix and half of her colon.  She was in the hospital for five days.

Detective Daniel Hatfield of the San Diego Police Department's gang unit testified that at the time of the shooting, OKB was an Asian criminal street gang with 106 documented members.  Hatfield said OKB engaged in a

---

[7]    During a search of Giraud's residence, police located the firearm, which was a .45 caliber semiautomatic handgun.  Ballistics tests showed the gun fired the shell casings that were found at the crime scene.  Testing of the DNA collected from the gun was a mixture of three possible DNA contributors:  Phommachanh, Sirypangno and a third person.

pattern of criminal gang activity and the gang's primary activities were serious assaults, burglaries, automobile thefts and murders.

Detective Hatfield also discussed gangs in general and explained that reputation and respect are of upmost importance to gangs because they enable a gang to instill fear among rival gangs and people who live in the community. People who live in the community often are reluctant to testify against gang members because they fear retaliation from the gang. Gang members gain respect by committing violent crimes and by backing up their fellow gang members in fights. Hatfield also testified that disrespect to a gang member is considered disrespect to the entire gang. Such disrespect can take many forms, including a person looking at a gang member in the "wrong way." Gang fights easily escalate into violence. When gang members are involved in crimes, including murder, the gang's reputation for violence increases and the community's fear of and intimidation by the gang increases.

## II.

### *Procedural Background*

Sirypangno and Phommachanh were charged in an amended information with murder (§ 187, subd. (a); count 1), attempted murder (§§ 187, subd. (a), 664; count 2), and assault with a semi-automatic firearm (§ 245, subd. (b); count 3). It was further alleged that Sirypangno was a principal, that at least one principal personally used a firearm in the commission of the murder and attempted murder, proximately causing great bodily injury or death (§ 12022.53, subds. (d), (e)(1)), and that both Sirypangno and Phommachanh committed all three of the charged crimes for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

9

In 2008, a jury found Sirypangno guilty as charged. In *Sirypangno I*, this court affirmed his convictions.[8] (*Sirypangno I, supra*, D055015.)

In 2018, this court granted Sirypangno's petition for writ of habeas corpus in which he alleged his jury was improperly instructed on the natural and probable consequences theory of aiding and abetting first degree premeditated murder. (*In re Sirypangno* (June 25, 2018, D073602) [nonpub. opn.] (*Sirypangno II*); see *People v. Chiu* (2014) 59 Cal.4th 155, 158–159 (*Chiu*) ["We now hold that an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine. Rather, his or her liability for that crime must be based on direct aiding and abetting principles."]; *In re Martinez* (2017) 3 Cal.5th 1216, 1225 (*Martinez*) [holding the federal "beyond a reasonable doubt" standard applies when determining the prejudicial effect of a jury instruction marred by *Chiu* error].) We vacated Sirypangno's conviction for first degree murder and directed the superior court to modify the judgment to second degree murder if the People did not elect to retry Sirypangno for first degree murder. The People chose not to retry Sirypangno. In 2019, the trial court reduced Sirypangno's murder conviction to second degree murder and resentenced him.

In 2018, the Legislature passed Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437), which eliminated the natural and probable consequences theory of liability as a basis for a murder conviction. (Stats. 2018, ch. 1015, § 2.) In 2019, Sirypangno filed a petition for resentencing under former section 1170.95, which has since been renumbered as section

---

[8]     Phommachanh was tried separately.

1172.6 (Stats. 2022, ch. 58, § 10),[9] challenging the validity of his second degree murder conviction under the murder laws as amended by Senate Bill 1437. In 2020, after appointing counsel, the trial court denied the petition without issuing an order to show cause after concluding Sirypangno had not succeeded in making a prima facie showing of entitlement to relief.

In 2021, we granted Sirypangno's petition for writ of habeas corpus and vacated his attempted murder conviction after accepting the People's concession that the kill zone instruction provided to the jury with respect to his attempted murder charge was legally erroneous under *People v. Canizales* (2019) 7 Cal.5th 591. (*In re Sirypangno* (Oct. 14, 2021, D078705) [nonpub. opn.] (*Sirypangno III*); see *Canizales*, at pp. 607–608 [holding the kill zone theory applies where the defendant has a primary target and " 'reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located,' " but does not apply where the defendant "acted with only conscious disregard of the risk of serious injury or death for those around a primary target"].) We remanded the matter to the trial court with directions to allow the People to elect to retry Sirypangno on the attempted murder charge. At the evidentiary hearing held in 2022 with respect to Sirypangno's resentencing petition, the People informed the trial court they would not retry Sirypangno on the attempted murder charge, and the court granted the People's motion to dismiss that count.

Also in 2021, and concurrently with our decision in *Sirypangno III*, we reversed the trial court's order denying Sirypangno's petition for resentencing. (*People v. Sirypangno* (Oct. 14, 2021, D078188) [nonpub.opn.] (*Sirypangno IV*).) In *Sirypangno IV*, we accepted the People's concession that

---

9      For clarity, we will simply refer to section 1172.6.

the trial court erred and deviated from the statutorily mandated procedure for adjudicating resentencing petitions by engaging in factfinding at the prima facie stage. We remanded the matter to the trial court with directions to issue an order to show cause and hold an evidentiary hearing to determine whether Sirypangno was eligible to be resentenced on his murder conviction.

In July 2022, following remand and further briefing from the parties, the trial court held an evidentiary hearing. The prosecution, relying on the record of the jury trial, argued that Sirypangno was ineligible for resentencing because the evidence demonstrated beyond a reasonable doubt that Sirypangno was an aider and abettor of second degree murder who acted with implied malice. Sirypangno, also relying on the trial record, argued the evidence failed to demonstrate that he harbored implied malice.

In September 2022, the trial court issued an order denying Sirypangno's resentencing petition under section 1172.6. The court found the evidence showed beyond a reasonable doubt that Sirypangno "did, with the intent to kill, aid and abet the actual killer in the commission of second degree murder." This fifth appeal followed.

## DISCUSSION

### I.

*Our Decision in* Sirypangno II *Did Not Preclude the Trial Court from Finding That Sirypangno Was a Direct Aider and Abettor of the Murder*

Before we discuss Sirypangno's substantial evidence challenge, we must first consider an argument he raises under the doctrine of the law of the case. His argument is based on our decision in *Sirypangno II*, in which we vacated his first degree murder conviction after finding the trial court committed *Chiu* error by giving the jury an instruction that permitted it to convict him of first degree murder on a natural and probable consequences

12

theory. (See *Sirypangno II*, *supra*, D073602; *Chiu*, *supra*, 59 Cal.4th at pp. 158–159 [aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine].)

In *Sirypangno II*, after concluding the instruction given to Sirypangno's jury was not materially different from the instruction deemed erroneous in *Chiu*, we considered whether the error was harmless. The relevant harmlessness standard permitted us to affirm only if we concluded beyond a reasonable doubt that the jury actually relied on a direct aiding and abetting theory, which remained a legally valid theory of first degree murder after *Chiu*. (See *Martinez*, *supra*, 3 Cal.5th at p. 1218 ["*Chiu* error requires reversal unless the reviewing court concludes beyond a reasonable doubt that the jury actually relied on a legally valid theory in convicting the defendant of first degree murder"].) The People, who bore the burden of establishing harmlessness under this standard, did not "point to anything in the verdict showing beyond a reasonable doubt that the jury made the findings necessary to convict Sirypangno as a direct aider and abettor." Instead, they asserted the evidence in the record demonstrated beyond a reasonable doubt that the jury necessarily relied only on a direct aiding and abetting theory when it convicted Sirypangno of first degree murder.

In analyzing the merits of the People's harmlessness argument, we made several statements conveying our view of the facts and of the relative strength of the evidence supporting the valid aiding and abetting theory versus the invalid natural and probable consequences theory. We stated, for example, that Sirypangno's attack of Thompson "raises a reasonable doubt in this court regarding what Sirypangno believed Phommachanh would do and when he would do it." As another example, we commented that while the

evidence "shows a tacit agreement that Phommachanh would return to the party," it was "not entirely clear from the record . . . whether Sirypangno and Phommachanh agreed on what the backup would entail." We further stated that it was "not clear from the evidence that Sirypangno assailed Thompson knowing and intending that Phommachanh should shoot him," that we found it "reasonably plausible that Sirypangno thought Phommachanh would point the gun at Thompson to scare him, like Sirypangno had done to another individual earlier at the party," and that the fact that Phommachanh shot Thompson "does not prove that Sirypangno shared the same intent as Phommachanh."

Sirypangno contends the trial court was bound by these comments from *Sirypangno II* under the doctrine of the law of the case, and was precluded from finding he acted as a direct aider and abettor who harbored an intent to kill. He characterizes our statements in *Sirypangno II* as "a judicial determination that the evidence presented at [his] trial did not prove beyond a reasonable doubt that [Sirypangno], while harboring an intent to kill, directly aided and abetted Phommachanh in the commission of murder."

We disagree. The law of the case doctrine provides that when an appellate court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal . . . , and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular." (*Kowis v. Howard* (1992) 3 Cal.4th 888, 892–893.) "The principle applies to criminal as well as civil matters." (*People v. Shuey* (1975) 13 Cal.3d 835, 841 (*Shuey*).) However, the "application of the rule is . . . subject to the qualifications that 'the point of law involved must

14

have been necessary to the prior decision, that the matter must have been actually presented and determined by the court, and that application of the doctrine will not result in an unjust decision.' " (*Id.* at p. 842; see *Quackenbush v. Superior Court* (2000) 79 Cal.App.4th 867, 874 (*Quackenbush*) ["dicta . . . is not binding on the parties, the trial court or [intermediate appellate] court as law of the case"].)

There are three reasons why Sirypangno's reliance on the doctrine of the law of the case is unavailing. First, in *Sirypangno II* we were presented with a claim of instructional error, not an insufficiency of the evidence challenge. We determined only that the record failed to demonstrate beyond a reasonable doubt that the jury exclusively relied on a direct aiding and abetting theory, and not on a natural and probable consequences theory, in convicting Sirypangno of first degree murder. We neither considered nor decided whether there was insufficient evidence in the record upon which to conclude beyond a reasonable doubt that Sirypangno was guilty under a direct aiding and abetting theory. Thus, the issue raised in Sirypangno's resentencing petition was not " 'actually presented and determined by [this] court' " in *Sirypangno II*. (*Shuey*, *supra*, 13 Cal.3d at p. 842.)

Second, contrary to Sirypangno's argument, in *Sirypangno II* we expressly refrained from finding the trial evidence insufficient to support the conclusion that he acted as a direct aider and abettor. We stated: "Although it may be that this evidence would be sufficient to support a conviction under a direct aiding and abetting theory, the evidence also supports the theory that the murder was a natural and probable consequence of gang motivated battery."

Third, the relevant question in *Sirypangno II* was whether we could determine beyond a reasonable doubt that the jury's verdict finding him

15

guilty of first degree murder was based only on the still-valid direct aiding and abetting theory such that the error in instructing the jury with the invalid natural and probable consequences theory was harmless.  The assertions in which we offered our view of the facts and of the persuasiveness of the People's aiding and abetting theory went further than was necessary to answer this question.  Our factual commentary was therefore "not necessary or essential to our decision[ and] was dicta." (*Quackenbush*, *supra*, 79 Cal.App.4th at p. 874.)

Accordingly, we reject Sirypangno's contention that the foregoing comments from *Sirypangno II* were binding on the trial court as law of the case so as to preclude it from finding him guilty of second degree murder on a direct aiding and abetting theory.

## II.

*Substantial Evidence Supports the Trial Court's Finding That Sirypangno Is Guilty of Second Degree Murder Because He Directly Aided and Abetted Thompson's Murder and Acted with Express Malice*

A.    *Legal Principles*

1.    *Senate Bill 1437 and Senate Bill No. 775*

Senate Bill 1437 "was enacted to ' "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." ' " (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 93 (*Didyavong*).)  "Senate Bill 1437 did this by amending section 188, which defines malice, and section 189, which defines the degrees of murder. . . .  Amended section 188 states: 'Except as stated in subdivision (e) of Section 189, in order to be convicted of

murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime.' (§ 188, subd. (a)(3).) Amended section 189 states: 'A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] [or] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.' (§ 189, subd.(e).)" (*Didyavong*, at p. 94, first citation omitted.)

"Senate Bill 1437 also established resentencing relief for eligible defendants. . . . Under former section 1170.95 (now § 1172.6, subd. (a)), '[a] person convicted of felony murder or murder under a natural and probable consequences theory may file a petition' with the sentencing court to have his or her murder conviction vacated and to be resentenced on any remaining counts 'when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019' under Senate Bill 1437. After receiving a petition containing the required information, 'the court must evaluate the

17

petition "to determine whether the petitioner has made a prima facie case for relief." ' . . . If the defendant makes a prima facie showing of entitlement to relief, the court must issue an order to show cause and hold an evidentiary hearing." (*Didyavong*, *supra*, 90 Cal.App.5th at p. 94, citations omitted.)

"Effective January 1, 2022, Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775) amended section 1172.6 to clarify certain aspects of the law, including that (1) the burden of proof at a resentencing hearing under this section is 'on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder' under California law as amended by Senate Bill 1437 and (2) '[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' . . . Senate Bill 775 [also] clarified that the trial court's role in a section 1172.6 proceeding is to act as an independent fact finder and determine, in the first instance, whether the petitioner committed murder under the law as amended by Senate Bill 1437." (*Didyavong*, *supra*, 90 Cal.App.5th at pp. 94–95, citations omitted.)

2. *Aiding and Abetting Second Degree Murder*

Although Senate Bill 1437 eliminated natural and probable consequences liability for second degree murder, a defendant who did not personally kill may still be convicted of second degree murder under a direct aiding and abetting theory. (*People v. Reyes* (2023) 14 Cal.5th 981, 990; *People v. Gentile* (2020) 10 Cal.5th 830, 848–849 (*Gentile*).) " 'One who directly aids and abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law.' " (*People v. Vargas* (2022) 84 Cal.App.5th 943, 953 (*Vargas*).)

18

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151.) "Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2))." (*Gentile, supra,* 10 Cal.5th at p. 844; see also *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 500 [explaining that a killing is committed with implied malice when it is proximately caused by " ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life" ' "].)

Liability for a crime extends to the direct perpetrators of a crime as well as those who aid and abet the crime's commission. (See § 31; *Gentile, supra,* 10 Cal.5th at p. 843 ["A person who aids and abets the commission of a crime is culpable as a principal in that crime."].) "Guilt as an aider and abettor is guilt 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*People v. Powell* (2021) 63 Cal.App.5th 689, 710.) "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus— a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*People v. Perez* (2005) 35 Cal.4th 1219, 1225 (*Perez*).)

19

To act with the mental state necessary to be found guilty of second degree murder under a theory of express malice, the aider and abettor "must have 'knowledge of the unlawful purpose of the perpetrator' and 'the intent or purpose of committing, encouraging, or facilitating' the commission of the offense. . . . Alternatively, in the context of implied malice murder, the aider and abettor must know the perpetrator intends to commit a life-endangering act, intend to aid the perpetrator in the commission of that act, know the act is dangerous to human life, and act in conscious disregard for human life." (*People v. Curiel* (2023) 15 Cal.5th 433, 468 (*Curiel*), citation omitted.)

3.      *Substantial Evidence Standard of Review*

"We review the trial court's factfinding on the question of whether a defendant committed a murder under a still-valid theory for substantial evidence." (*Didyavong*, *supra*, 90 Cal.App.5th at p. 97.) "Under this familiar standard, ' "we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." . . . We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." . . . In so doing, [we] "presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*Vargas*, *supra*, 84 Cal.App.5th at p. 951, citations omitted.) " 'The same standard applies when the conviction rests primarily on circumstantial evidence.' . . . 'An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence.' " (*Didyvavong*, at p. 97, citation omitted.) When we review a decision under this standard, "[w]e will not reverse unless

20

there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision." (*Ibid.*)

B.    *Analysis*[10]

We first consider an issue the parties raise regarding the scope of our substantial evidence review.  Both sides agree that although the prosecution opposed Sirypangno's resentencing petition on the ground he acted with *implied* malice in aiding and abetting Phommachanh's murder of Thompson, the trial court denied the petition on the finding Sirypangno acted with *express* malice in aiding and abetting Phommachanh's murder of Thompson. We agree with the parties that the trial court found Sirypangno acted with express malice in aiding and abetting the murder.  In its order denying Sirypangno's petition, the court stated it found "beyond a reasonable doubt, that he did, *with the intent to kill*, aid and abet the actual killer in the commission of second degree murder."  (Italics added.)  The italicized phrase was the equivalent of a finding of express malice.  (See *People v. Smith* (2005)

---

10    In December 2022, Sirypangno filed a motion with this court seeking judicial notice of the transcripts and records from his direct appeal of the judgment of conviction in case number D055015.  We grant this request.  In the motion, Sirypangno also seeks judicial notice of "[t]he records" in case numbers D073602, D078188, and D078705, without specifying or citing any particular records to be noticed.  We grant this request in part as to our prior decisions in case numbers D073602, D078188, and D078705.  To the extent Sirpangno seeks judicial notice of any other records from the latter three cases, this request is denied for failure to identify the records to be noticed and establish their relevance to this appeal.  (See *People v. Franklin* (2016) 63 Cal.4th 261, 280 [motion for judicial notice of document denied for failure to establish document's relevance]; accord, *People v. Young* (2005) 34 Cal.4th 1149, 1171, fn. 3 (*Young*).)  In sum, we grant in part and deny in part Sirypangno's motion.

37 Cal.4th 733, 739 (*Smith*) ["Intent to unlawfully kill and express malice are, in essence, 'one and the same.' "].)

However, the parties dispute whether we must limit our review to determining whether there is sufficient evidentiary support for the conclusion Sirypangno acted with express malice, or whether we can also affirm if we find the theory he acted with implied malice to be factually supported. Sirypangno, relying on *Eaton v. Tulsa* (1974) 415 U.S. 697, contends our review must be limited to the express malice theory. *Eaton* was a criminal contempt case in which the state appellate court was held to have violated the defendant's due process rights by affirming his conviction after determining substantial evidence supported convicting him of contempt on an alternate ground not alleged in the information. Sirypangno argues we would run afoul of *Eaton*'s holding if we were to affirm the trial court's ruling on a factual theory it did not expressly adopt, even if (as was the case here) that theory was advanced by the prosecution as a basis for convicting him.[11]

The People contend we may affirm if we find sufficient evidentiary support for either the express malice or implied malice theories of guilt for aiding and abetting second degree murder. They rely in part on *People v. Edwards* (2013) 57 Cal.4th 658, in which the prosecution advanced two theories of first degree murder—murder by means of torture and felony-murder burglary—and the jury found the defendant guilty of first degree murder without "specify[ing] the theory on which it rested its verdict." (*Id.* at

---

[11]    Sirypangno has not argued the trial court erred by denying his petition on the basis of a theory not advanced by the prosecution. Any such claim has therefore been forfeited. (See e.g., *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9 [claim forfeited where not raised in opening brief]; accord *People v. Harris* (2008) 43 Cal.4th 1269, 1290; *People v. Barragan* (2004) 32 Cal.4th 236, 254, fn. 5; *People v. Taylor* (2020) 43 Cal.App.5th 1102, 1114.)

22

p. 715.)  The People contend we must do as the *Edwards* court did and affirm on any theory of guilt supported by the evidence, even if (as was the case here) the factfinder's decision expressly rested on only one of those theories.

Ultimately, we do not need to resolve the parties' dispute about our ability to affirm on the basis that Sirypangno acted with implied malice.  The parties agree, and so do we, that we can affirm the trial court's decision to the extent we conclude substantial evidence in the record supports its finding that Sirypangno acted with express malice in aiding and abetting Phommachanh's murder of Thompson.  (See e.g., *Didyavong, supra*, 90 Cal.App.5th at p. 97 ["We review the trial court's factfinding on the question of whether a defendant committed a murder under a still-valid theory for substantial evidence."].)  Because our review of the record persuades us the express malice theory of guilt is factually supported, we can affirm on this basis without addressing whether it would also be proper to affirm under an implied malice theory.

For the following reasons, we conclude that substantial evidence supports the trial court's finding that Sirypangno aided and abetted the murder of Thompson and did so with the intent to kill.  Again, "proof of aider and abettor liability requires proof in three distinct areas:  (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus—conduct by the aider and abettor that in fact assists the achievement of the crime." (*Perez, supra*, 35 Cal.4th at p. 1225.)

Here, Sirypangno concedes the evidence sufficiently demonstrates that Phommachanh, the direct perpetrator, committed a crime:  he murdered Thompson.  Sirypangno also raises no dispute whether the evidence

23

establishes he engaged in conduct—e.g., supplying Phommachanh with the murder weapon; starting the brawl that ended in Thompson's death—that in fact assisted Phommachanh in the achievement of that crime. We agree with his concessions. Our review of the record persuades us both of these requirements of direct aiding and abetting liability have ample evidentiary support.

Instead, Sirypangno's challenge is limited to disputing whether substantial evidence supports the remaining requirement for aiding and abetting a murder with express malice—that is, whether Sirypangno knew Phommachanh intended to kill Thompson and whether Sirypangno shared that intent. (See *Curiel, supra,* 15 Cal.5th at p. 468 [aider and abettor of second degree express malice murder "must have 'knowledge of the unlawful purpose of the perpetrator' and 'the intent or purpose of committing, encouraging, or facilitating' the commission of the offense"].) Viewing the record in the light most favorable to the judgment, we conclude there is sufficient substantial evidence in the record to support such a finding beyond a reasonable doubt.

Although direct evidence of Sirypangno's intent was lacking, circumstantial evidence supported the inference that in aiding and abetting Phommachanh's commission of the murder, Sirypangno harbored express malice. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055 [because " '[e]vidence of a defendant's state of mind is almost inevitably circumstantial . . . circumstantial evidence is as sufficient as direct evidence to support a conviction' "]; *Smith, supra,* 37 Cal.4th at p. 741 ["it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may . . . be inferred from the defendant's acts and the circumstances of the crime"].) Witnesses who observed Sirypangno and

24

Phommachanh's conduct before, during, and after the shooting testified to the following facts, which collectively support this conclusion.

Sirypangno and Phommachanh were good friends as well as fellow OKB members. Earlier in the evening, before the Mira Mesa party at which Thompson was shot and killed, Phommachanh was overheard telling someone—inferably, Sirypangno[12]—to bring a "strap" (street lingo for a "gun") because there might be some "funk" (meaning "problems") at that party.

Once Sirypangno and Phommachanh arrived at the party, their demeanor was aggressive. Phommachanh pushed his way past the entrance gate, and both men were "mad-dogging" the invited party guests. Tensions appeared to escalate after Farhan and his friends approached Phommachanh and Sirypangno in the backyard to tell them to calm down or leave the party. One witness testified there were 10 people in Farhan's group, and although they did not intend to do anything to Phommachanh or Sirypangno, they looked "threatening." There was "cussing" back and forth between Farhan's group and the OKB members. It was at this point that Sirypangno jumped on a retaining wall, raised his shirt, pulled out a .45-caliber semiautomatic handgun, and chambered a bullet while pointing the gun at Farhan from a distance of only one or two feet as Mai, who was standing nearby, cursed and said "OKB." One witness also heard Sirypangno say "OKB" in a raised voice.

Testimony of multiple witnesses established that Sirypangno then jumped over the backyard fence, gun in hand, breaking one of the fence's wooden planks in the process. He then got into another conflict with another

---

[12] Sirypangno was not present at the Mira Mesa party when Phommachanh made this call; he thereafter joined Phommachanh at the party and brought a gun, later used in the shooting.

guest, this time Thompson, over his perception that Thompson had slighted him by calling him a "bitch" and telling him "fuck you, suck my dick." Sirypangno responded by throwing a two-and-one-half-foot-long wooden plank—missing Thompson's head only because Thompson moved—displaying his gun, and telling Thompson, "I'm a real fucking gangster, you'll see when you get out" or "I'll show you when you get outside."

K.A., who witnessed this altercation from inside the backyard, testified Thompson took Sirypangno's threat seriously. According to Detective Hatfield, calling a gang member a "bitch" or saying "you can suck my dick" would be taken by a gang member as a sign of disrespect, and that acts of disrespect toward a gang member generally result in violence, including a shooting.

After Thompson's over-the-fence exchange with Sirypangno, E.N. saw Sirypangno approach Phommachanh. Sirypangno appeared angry and was "very firm with his actions." Sirypangno talked to Phommachanh. Rattana then pulled up in Phommachanh's car, headlights facing west (the same direction in which she pulled up later when she returned with Phommachanh). Phommachanh got in the front passenger seat, and Sirypangno "[d]iscreetly" passed him the gun. Rattana testified there was a conversation between Phommachanh and Sirypangno at this point, but she could not recall what was said. Rattana testified Phommachanh did not seem surprised Sirypangno had handed him the gun.

Minutes after Rattana and Phommachanh drove off, Phommachanh received a phone call asking him to return to the party to pick up Sirypangno. E.N., who placed the call for Sirypangno, testified that Phommachanh said he and Rattana were already on their way back. Rattana testified that as they headed back to the house, Phommachanh, moving "quickly," retrieved the

26

gun and donned the bandana. Phommachanh's actions led Rattana to think he was probably going to shoot the gun "at someone." When they returned to the party, Rattana stopped the car at the corner of the house with the headlights facing west and remained in the driver's seat of the car with the engine running.

Phommachanh then exited the car, gun in hand, and began "waving" the gun while yelling "who wants it" and "all right, we're going to do this shit." Sirypangno did not try to get in the car, despite having had E.N. call Phommachanh for a ride. Instead, Sirypangno, Phommachanh, and the other OKB gang members who had attended the party lined up in front of the car. They stood in that location "looking towards the exit of the party where everyone was exiting." E.N. testified there was a conversation between Sirypangno and Phommachanh although he did not know what was said.

When Thompson emerged from the party, Sirypangno "pointed him out," said "you the fool that fucking told me to suck your dick," and struck him. Accounts of the ensuing fight differed. According to E.N., after Sirypangno struck Thompson, two of the other OKB members "jump[ed]" Thompson and it became a three-on-one fight. As Sirypangno and the two other gang members continued fighting Thompson, Phommachanh stepped forward from the area where he had been lined up in front of his car, pulled out the gun, pointed it at Thompson, and attempted to shoot. When the gun did not fire, Phommachanh "fiddl[ed]" with the gun and pulled back the slide to clear the unfired round. He then fired five shots in Thompson's direction, hitting Thompson, K.A., and Joyce and killing Thompson. Phommachanh did not fire a warning shot; the "very first place" he pointed the gun was "right at [Thompson]." Thompson fell to the ground and "was motionless."

The OKB members fled to the awaiting car with Rattana in the driver seat and the engine still on.  Sirypangno did not appear to be injured.  Once all the gang members were in the car, Rattana "peel[ed] out"—she pressed the accelerator so that the tires lost traction and spun—and headed westbound on an adjacent street.  Everyone in the car was nervous; Sirypangno said, "shit, where the hell we going to put the strap at."  Phommachanh gave the gun to Sirypangno, who told Rattana to drive to "Striker's" (i.e., Giraud's) house.  When Rattana stopped there, Sirypangno exited with Phommachanh; the gun was later recovered from a rice bin at Giraud's house.

A reasonable fact finder could infer from the totality of these facts that Sirypangno acted with express malice in aiding and abetting the murder of Thompson.  Even before Sirypangno became embroiled in his argument with Thompson, he revealed a willingness to use a gun in confrontations with partygoers when he racked the gun to chamber a bullet and aimed it directly at Farhan at close range.  But it was the verbal exchange with Thompson that appeared to particularly provoke Sirypangno's rage.  According to Detective Hatfield, the language Thompson used would have been perceived by a gang member as disrespectful, and the perceived disrespect was sufficient to motivate a violent response—including a shooting—from gang members.  (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 (*Glukhoy*) [motive is a circumstance to be considered in determining aiding and abetting liability]; *Smith, supra,* 37 Cal.4th at p. 741 [evidence of motive is probative of intent to kill].)

Sirypangno's actions before the shooting support the conclusion he told Phommachanh what Thompson had said and then, with Phommachanh, formulated a plan to retaliate against Thompson by committing an act of

28

violence against him. The evidence is overwhelming that their plan involved shooting Thompson. Sirypangno approached Phommachanh before he left the party with Rattana, and the two of them were continuing to talk when Sirypangno "[d]iscreetly" handed Phommachanh the gun. The subsequent phone call to Phommachanh telling him to return to give Sirypangno a ride home was inferably pretextual. Phommachanh started putting on the bandana before he got back to the party; when he arrived, Sirypangno made no effort to get in the car, and instead Phommachanh immediately got out, waved the gun, and used words that conveyed an intent to shoot ("who wants it" and "all right, we're going to do this shit"). Although Sirypangno asked to use E.N.'s cell phone to call Phommachanh, it was E.N. who placed the call. Thus there was no opportunity for Sirypangno and Phommachanh to speak and further coordinate their actions. Yet their subsequent actions— Phommachanh telling E.N. he was already on the way back, donning the bandanna even before his arrival, retrieving the gun, lining up with Sirypangno and the other OKB members— demonstrate that Sirypangno and Phommachanh had already coordinated their plan before execution.

That the men's plan specifically entailed inflicting Thompson with a fatal wound was supported by the evidence of both men's behavior during and after the gang assault. After Sirypangno pointed out Thompson and then struck him, Phommachanh stepped forward and pointed the gun directly at Thompson from a short distance of eight feet away and pulled the trigger. When his first attempt failed, he racked the slide again and successfully fired five shots in total, stopping only after Thompson fell. Phommachanh did not fire a warning shot; instead, he immediately pointed the gun directly at Thompson. Although the evidence showed not all of the subsequent shots actually hit Thompson, Phommachanh's actions nevertheless demonstrated

29

that Thompson was his target and his intent was to kill Thompson. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1218 ["The act of shooting a firearm toward a victim at close range in a manner that could have inflicted a mortal wound had the shot been on target is sufficient to support an inference of an intent to kill."]; *Smith, supra*, 37 Cal.4th at p. 742 [the fact that a bullet misses its mark is not dispositive, since the very act of firing a weapon in a way that could have caused a mortal wound if the bullet had been on target is sufficient to support an inference of intent to kill].)

Sirypangno, who was seen speaking with Phommachanh before Phommachanh initially drove off with the gun, and again after Phommachanh returned, waving the gun around and yelling "who wants it," inferably knew of Phommachanh's homicidal purpose. That Sirypangno continued fighting and did not object or attempt to intercede as Phommachanh aimed the gun at Thompson and fired it again and again suggests Sirypangno was not surprised by Phommachanh's actions and did not object to them. (See *Glukhoy, supra,* 77 Cal.App.5th at p. 599 ["It is well settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime."].)

Sirypangno's conduct after the shooting further supports the conclusion he intended for Phommachanh to inflict Thompson with a fatal wound. (*Glukhoy, supra*, 77 Cal.App.5th at p. 599.) Sirypangno did not summon aid, nor did he attempt to distance himself from the crime. Instead, he fled side by side with Phommachanh, accepted possession of the murder weapon, and took responsibility for hiding it. (See *People v. Lasko* (2000) 23 Cal.4th 101, 112 [defendant's actions after striking fatal blow "were not those of an

30

unintentional killer," including because defendant did not call an ambulance and tried to obscure evidence of the killing].)

For all of these reasons, there is sufficient substantial evidence in the record to support the trial court's conclusion that Sirypangno acted with express malice in aiding and abetting Thompson's murder. We do not find Sirypangno's arguments to the contrary persuasive. He contends, first, there is "no evidence" that when he gave Phommachanh the gun he told Phommachanh he was doing so because he wanted Phommachanh to kill Thompson. He argues further that he would not have allowed Phommachanh to drive away if this was his plan. We reject both assertions. The evidence showed Sirypangno talked with Phommachanh before Phommachanh left with Rattana, and again as Phommachanh was getting in the car to leave. Although there was no evidence of the precise content of their conversation as Phommachanh entered the car, for the reasons we have already discussed, a factfinder could reasonably infer from the events that followed that they were concocting a plan whereby Phommachanh would leave with the gun, don the bandana, and return with his facial features concealed in the hopes of avoiding detection for the planned shooting.

Similarly, Sirypangno contends there is "no evidence" he asked Phommachanh to return to the party because he had formed the intent to kill in the few minutes Phommachanh was away, and that there is no evidence he spoke to Phommachanh about shooting Thompson after Phommachanh returned. No such evidence is necessary, however, given our conclusion that the record supports the inference their plan had already been developed prior to Phommachanh leaving.

Next, Sirypangno asserts that "[a] verbal dispute between a member of a street gang and someone like Thompson who was not a member of a street

31

gang rarely results in the death of the non-gang member." Sirypangno does not accompany this factual assertion with any citation to the record demonstrating that it has evidentiary support. We will not consider claims based on factual assertions that are not accompanied by citations to the record. (*People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

Sirypangno's remaining arguments posit nonculpable inferences we might draw from certain witnesses' testimony. That there might be evidence in the record to support inferences favoring his position is not material to our substantial evidence review. Provided that the factfinder's decision is supported by substantial evidence (as we have determined that it is), the fact that a contrary finding is also supported is irrelevant. Stated differently, " '[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.' " (*People v. Clark* (2016) 63 Cal.4th 522, 626 (*Clark*).)

Nor do we find Sirypangno's arguments to be persuasive. He asserts that if he intended to kill Thompson, he could have done so himself while arguing with Thompson over the backyard fence. However, although Sirypangno did not shoot Thompson at his earliest opportunity, it is inferable from his and Phommachanh's subsequent actions that both he and Phommachanh nevertheless decided later to have Phommachanh shoot and kill Thompson. (See *Smith*, *supra*, 37 Cal.4th at p. 741 [a defendant's actions may serve as circumstantial evidence of intent].) That Sirypangno arguably could have killed Thompson sooner does not negate this inference.

Sirypangno further asserts that Thompson was taller and heavier than he; if the plan was to have Phommachanh shoot Thompson, this could have been more logically and safely achieved by identifying Thompson and then

32

standing out of the way while Phommachanh shot him. However, this position overlooks Detective Hatfield's testimony about the importance of respect within gang culture, and specifically Hatfield's testimony that a gang member who gets in a physical fight which then leads to a shooting would gain respect from his gang, would benefit by showing his fellow gang members "that he's backing his own gang set," and would be "elevated in . . . stature within the gang itself." A factfinder could reasonably infer Sirypangno's decision to physically attack Thompson in the leadup to the shooting served this goal of earning respect within his gang, even if it was not the most logical or safest course of action.

Next, Sirypangno argues Phommachanh looked "scared" during the shooting and was "shooting crazy," and suggests Sirypangno therefore could not have known Phommachanh intended to kill Thompson. His description of Phommachanh's demeanor is based on the testimony of Phommachanh's cousin Boualouang. However, Boualouang's testimony about Phommachanh "shooting crazy" was contradicted by E.N., who testified Phommachanh fired the shots "at the victim" and agreed "the very first place that [Phommachanh] pointed [the gun] was *right at the victim* when he fired[.]" (Italics added.) The trial court impliedly resolved this conflict by rejecting Boualouang's testimony in favor of E.N.'s description of Phommachanh's aiming of the gun directly at Thompson, from which a reasonable observer could discern that Phommachanh intended to inflict Thompson with a fatal wound. (See *Young, supra,* 34 Cal.4th at p. 1181 ["[r]esolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact" and "unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction"].) Further, we are not persuaded that "looking scared" while

shooting at a victim is inconsistent with the shooter harboring an intent to kill that victim, nor did the trial court have to accept Boualouang's characterization of Phommachanh's facial expression.  (See *Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 67–68 (*Stevens*) [" '[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material.' "]; accord *People v. Fuiava* (2012) 53 Cal.4th 622, 715, fn. 34 (*Fuiava*).)

Similarly, Sirypangno cites Rattana's testimony that he made statements like "oh, shit, oh, shit" in the car after the shooting, which he asserts is evidence he was shocked and surprised and therefore must not have foreseen the shooting.  We disagree that these statements, even assuming they are properly interpreted as expressions of shock or surprise (as opposed to a rush of adrenaline), are inconsistent with the conclusion that before the shooting happened his intent was for Phommachanh to shoot Thompson.  Further, the trial court was not required to accept Rattana's testimony with respect to Sirypangno's demeanor after the shooting. (*Stevens*, *supra*, 9 Cal.3d at pp. 67–68; *Fuiava*, *supra*, 53 Cal.4th 622, 715, fn. 34.)

Next, Sirypangno contends the murder was out of proportion with the events leading up to it, and that this demonstrates he neither foresaw nor intended for Phommachanh to shoot and kill Thompson.  However, courts have recognized that mere verbal altercations may be sufficient to motivate a murder.  (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102 [stating that the law does not require that a murderer "have a 'rational' motive for killing"; "[a]nger at the way the victim talked to him [citation] or any motive, 'shallow

34

and distorted but, to the perpetrator, genuine' may be sufficient"].)  Here, Detective Hatfield's testimony established that perceived acts of disrespect against a gang member "will" result in violence, including a shooting, and that calling a gang member a "bitch" or telling him to "suck my dick" would be seen by a gang member as disrespectful.  Further, the testimony of numerous witnesses who observed the events leading up to the murder showed that first Sirypangno and then Phommachanh were angered by Thompson's words, and that the duo came up with a plan for retaliation that involved the gang assault and fatal shooting of Thompson.  Thus, proportionate or not, the trial evidence sufficiently demonstrated that the murder was indeed the intended result of Sirypangno and Thompson's earlier verbal altercation.

Similarly, Sirypangno, relying on the probation report prepared for the purpose of Phommachanh's sentencing in the underlying case, contends it shows Phommachanh's criminal history before the murder did not include violent offenses, and that this shows he could not have foreseen that Phommachanh would commit a homicide.  We are not persuaded.  Phommachanh's probation report was prepared after the jury trial in the underlying case.  Sirypangno cites no evidence in the record demonstrating that at the time of the murder he was aware of Phommachanh's prior criminal record.  Moreover, we disagree with the proposition that a particular homicide is unforeseeable unless the perpetrator was previously convicted of a similar offense.

Sirypangno's remaining points are equally unavailing.  He points to testimony of E.N. to the effect that E.N. thought Phommachanh would only scare Thompson with the gun, not shoot him.  He relies on Boualouang's testimony that he overheard Sirypangno saying he "might freaking sock"

35

Thompson, and Boualouang himself did not expect anything other than an ordinary fight. He further observes that he only pointed the gun at Farhan's group during the backyard altercation and did not shoot. He argues this evidence supports the conclusion he did not anticipate or intend for Phommachanh to shoot Thompson, let alone kill him. Again, however, when we review a factfinder's decision for substantial evidence, we determine only whether there is sufficient evidence of reasonable, credible, and of solid value from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (See *Vargas, supra*, 84 Cal.App.5th at p. 951.) For the reasons we have already explained, we conclude the record does contain substantial evidence supporting the trial court's determination that Sirypangno acted with the intent to kill in aiding and abetting the murder of Thompson. That the record might also contain evidence supportive of a different conclusion does not establish a basis for reversal. (*Clark, supra*, 63 Cal.4th at p. 626 [" '[w]here the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal' "].)

For all of these reasons, we reject Sirypangno's substantial evidence challenge and affirm the trial court's order denying his petition for resentencing under section 1172.6.

## III.

### *We Will Remand the Matter so the Trial Court Can Fully Comply with Our Disposition in* Sirypangno III

In *Sirypangno III*, we vacated Sirypangno's attempted murder conviction and remanded the matter to the trial court with directions to allow the People to elect to retry Sirypangno on the attempted murder charge. Our

disposition in that case further instructed the trial court that if the People did not elect to bring Sirypangno to trial on the attempted murder charge within the time prescribed by law, the trial court was to enter judgment reflecting vacatur of the attempted murder conviction and resentence Sirypangno accordingly. (See *Sirypangno III, supra*, D078705.)

At the 2022 evidentiary hearing held with respect to Sirypangno's section 1172.6 petition, the People elected to not retry Sirypangno on the attempted murder charge and the trial court granted the People's motion to dismiss the charge. However, the record on appeal does not include an order or amended abstract of judgment reflecting vacatur of the attempted murder conviction or any subsequent resentencing on the remaining counts. Instead, the most recent abstract of judgment in the appellate record, which is dated April 17, 2019, shows that Sirypangno stands convicted of attempted murder and is serving a seven-year sentence for that conviction.

"[W]hen an appellate court remands a matter with directions governing the proceedings on remand, ' "those directions are binding on the trial court and *must* be followed." ' " (*People v. Ramirez* (2019) 35 Cal.App.5th 55, 64.) In supplemental briefing, the parties agreed the trial court has not yet fully complied with our disposition in *Sirypangno III*. Accordingly, we will remand the case to the trial court with instructions to complete the actions necessary to do so.

## DISPOSITION

The trial court's order denying Sirypangno's petition for resentencing is affirmed.

The matter is remanded to the trial court with instructions to complete the following actions necessary to fully comply with our disposition in *Sirypangno III*: (1) issue an order reflecting vacatur of the attempted murder

37

conviction, (2) resentence Sirypangno, and (3) issue an amended abstract of judgment reflecting the vacatur of the attempted murder conviction and the new sentence.

DO, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.